```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION


K.A., individually and on        )
behalf of L.A., a minor,         )
                                 )
          Plaintiff,             )
                                 )
                                 )
     v.                          )   No. 23 C 15739
                                 )
                                 )
United Healthcare Insurance      )
Company and United Behavioral    )
Health,                          )
                                 )
          Defendants.            )
```

<u>Memorandum Opinion and Order</u>

L.A. received mental health treatment at a residential care facility from September 7, 2021 until August 4, 2022. During that period, L.A.'s father, K.A., was a participant in a group health plan (the "Plan") administered by United Healthcare Insurance Company (collectively with United Behavioral Health, "United"), under which L.A. was a beneficiary. United provided benefits for L.A.'s residential treatment through until October 10, 2021, after which it notified K.A. that further residential treatment would not be covered. K.A. and J.A. (L.A.'s mother) contested that determination through two levels of internal appeals as well as an external review, but to no avail.

K.A. brought this suit on behalf of himself and L.A., claiming United's adverse benefit determination violated the Employee Retirement Income Security Act (ERISA). The parties have filed cross-motions for summary judgment. Because United acted arbitrarily and capriciously in denying K.A.'s appeals as explained further below, K.A.'s motion for summary judgment is granted and United's motion is denied.

I.

The following facts come from the parties' statements of material facts and the administrative record.[1] They are undisputed except where noted.

**The Plan**

The Plan was administered by United Healthcare Insurance Company, and according to the complaint United Behavioral Health is the mental health arm of the company and was closely involved in the processing of claims and appeals in this case. The Plan pays benefits for "Covered Health Care Services," AR 2034, 2195,[2]

---

[1] The parties submitted an agreed administrative record with pages identified by Bates numbers UNITED_KA_000001 through UNITED_KA_002792. *See* ECF 43, 43-1, 43-2, 43-3. In this opinion, I cite to the administrative record as "AR" followed by the number, with "UNITED_KA_" and any superfluous zeros omitted. So, for example, citation to the first page of the administrative record in this opinion would be AR 1.

[2] One of the Plan documents was in effect for 2021, *see* AR 1992–2150, and one was in effect for 2022, *see* AR 2154–2307. The terms

2

which are, according to the Plan, those services that are "Medically Necessary," AR 2037, 2198. A service is "Medically Necessary" in turn if it is, among other things, "[i]n accordance with *Generally Accepted Standards of Medical Practice*,"[3] "[c]linically appropriate," "[n]ot mainly for [the beneficiary's] convenience or that of [their] doctor," and "[n]ot more costly than an alternative drug, service(s), service site or supply" that is at least equally effective. AR 2097-98, 2254-55.

**L.A.'s History and Treatment at Shelterwood**

According to K.A., L.A. struggled for years with mental health problems including anxiety, depression, self-harm, suicidal ideation, and at least one suicide attempt. K.A. and J.A. sought various forms of treatment, but none led to lasting improvement.[4]

---

of the two versions do not materially differ, but for ease of reference I cite both.

[3] The Plan explains the meaning of "Generally Accepted Standards of Medical Practice," *see* AR 2098, 2254-55, but that definition is not relevant for purposes of these motions.

[4] The record from the relevant period suggests L.A. is either nonbinary or a transgender man. However, K.A. states in one of his briefs that "[b]ecause the record does not shed light on whether L.A. is now living as a nonbinary or trans-identifying individual, and because L.A.'s medical records use she/her pronouns, Plaintiff uses she/her pronouns in this briefing." Pl. Resp., ECF 55 at 4 n.2. It is puzzling that K.A.--L.A.'s father--would need record evidence to know L.A.'s gender identity or pronouns. Given the unfortunate lack of clarity, in this opinion I will avoid using pronouns to refer to L.A., though they will appear in direct quotes from the record.

United responds to these facts as irrelevant to the case, claiming that only L.A.'s condition starting on the date United denied additional coverage is material. On September 7, 2021, L.A. began treatment at Shelterwood, a residential treatment facility in Missouri.

On September 20, 2021, Shelterwood staff noticed 15 new "self harm marks" on L.A.'s left hand, which L.A. informed staff were self-inflicted using a metal spring. AR 595. On September 22, 2021, L.A. "spent time talking with staff about how much they hate their parents" and L.A. spoke to K.A. and J.A. on the phone, which according to Shelterwood staff notes "did not go well." AR 591. On September 23, 2021, L.A. "talked about not ever wanting to be old and how she wants to die young" and "said that she wanted to name her grass [L.A.] because she could cut herself that way." AR 583. On September 27, 2021, L.A. "explained to staff that the reason she almost committed suicide [was] because of her gender dysphoria." AR 570.

On October 7, 2021, Shelterwood staff reported that L.A. "has been creating a character that is very dark and satanic," and that L.A. discussed with staff "how young she was when she was introduced to porn and how most of her depression is from feeling left out." AR 539. L.A. had a phone call with K.A. and J.A. later that day which again, according to staff, "did not go well" and involved L.A.'s parents yelling. *Id.* That day at therapy with Paul

4

Wilson (L.A.'s counselor at Shelterwood), L.A. reported "[p]essimism and hopelessness"; "[i]nsomnia, early-morning wakefulness, or sleeping too much"; "[i]rritability"; "[l]oss of interest in things once pleasurable"; "[d]igestive problems that don't get better, even with treatment"; "[p]ersistent sad, anxious, or 'empty' feelings"; and "[s]uicidal thoughts or attempts." AR 537. That record also states that L.A. "has frequent SI [suicidal ideation]," though perplexingly also reports that L.A. denied "[s]uicidal thoughts." *Id.*

During family therapy with Wilson on October 21, 2021, L.A. reported "[t]rouble concentrating, remembering details, and making decisions," as well as "[f]atigue," but denied "[s]uicidal thoughts," "[s]uidical gestures," "[s]elf injurious behaviors," and "[h]omicidal [i]deation." AR 488. L.A.'s progress notes reflect continued denial of "[s]uicidal thoughts," "[s]uicidal gestures," "[s]elf injurious behaviors," and "[h]omicidal [i]deation" from then on. *See* Def. Add'l Stmt. of Material Facts, ECF 57 ¶ 5 (citing numerous progress reports in the administrative record and undisputed by K.A.).

**Initial Denial of Benefits**

Around October 14, 2021, United sent L.A.'s case for peer-to-peer review conducted by Ronald Beach, M.D. Dr. Beach considered various clinical notes and information--though was unable to get

in touch with anyone at Shelterwood--and determined that continued residential care was not medically necessary. He calculated a composite CASII score[5] of 18, which falls short of the score range for recommended residential treatment. One of United's Behavioral Medical Directors, Jeffrey C. Uy, M.D., agreed with Dr. Beach's determination.

In an October 18, 2021 letter signed by Dr. Uy, United denied further coverage from October 11, 2021 onward. The letter offered the following explanation:

> We have denied the medical services requested because we reviewed your clinical notes. The criteria are not met because you no longer seem to need the intensity of residential care. You have gotten better during more than a month of residential. You have attended groups. You seem to have learned better coping skills. You still need help with how you get along with your family. This could be done in a Partial Hospital Level of Care or an Intensive Outpatient Level of Care.

AR 6. The letter did not cite any of L.A.'s medical records, but specified that "[t]he Guideline/Policy/Criteria used for the decision" was the CASII tool and provided a link for "more information about the Guidelines used for this decision." AR 7.

---

[5] The American Association of Community Psychiatrists CALOCUS-CASII Child and Adolescent Level of Care/Service Intensity Utilization System (CALOCUS-CASII), or "CASII," is the diagnostic tool United used to determine the appropriate level of care in this case. CASII recommends a composite score from 23 to 27 for residential treatment.

**First-Level Appeal**

K.A. and J.A. requested an urgent appeal. United's appeal reviewer, Kenneth Fischer, M.D., spoke with Shelterwood's Paul Wilson on October 26, 2021. According to United's internal notes, Wilson stated that L.A. "continue[d] to be stable from a behavioral standpoint" and was engaging in "no SIB [self-injurious behavior] or aggression" and that there was "no SI [suicidal ideation]," "HI [homicidal ideation]," "AVH [audio-verbal hallucinations]," "mania," "helplessness or hopelessness." AR 1965. The notes also reflect Wilson's view that "the main issue is around the member's gender identity" and "her perception of parental lack of acceptance." AR 1965–66. Wilson further "express[ed] understanding that based on the CASII tool, the member no longer meets for a 24 hour type care." AR 1966. Based on this interview and other clinical information, Dr. Fischer upheld the benefit denial determination.

Two United Behavioral Medical Directors, Sherifa Iqbal, M.D., and Theodore Allchin, M.D., reviewed and agreed with Dr. Fischer's conclusions. On October 26, 2021, the same date as Dr. Fischer had interviewed Wilson, Drs. Iqbal and Allchin signed a letter communicating this result. The letter explained that L.A. did not meet the criteria for continued coverage at Shelterwood because:

> Your child has made progress and no longer meets the guideline for coverage of treatment in this setting. Your child could be treated in a less intensive setting.

7

In your child's case:
Your child has improved.
There are no current safety concerns.
Your child presents minimal behavioral management challenges requiring 24-hour care.
Your child is medically stable.
Your child takes and tolerates medication; no changes are anticipated.
Your child is able to participate in treatment.
Your child is learning and using some healthier coping skills.
Your child has the support of family.
Care and recovery could continue in a non-24-hour setting.

AR 61. Like the initial letter, this one did not cite L.A.'s medical records but stated that the reviewers used the CASII tool and that they had reviewed L.A.'s "clinical case notes" and "talked to [L.A.'s] provider." *Id.*

**Second-Level Appeal**

K.A. submitted a second-level appeal on December 17, 2021.[6] In a letter, K.A.[7] described L.A.'s medical history, including a history of self-harm and suicide attempts, as well as resistance to outpatient treatment and inconsistent adherence to medication schedules outside the residential setting. In the letter, K.A.

_____

[6] For reasons not entirely clear, United's records reveal that Shelterwood canceled this appeal on December 30, 2021. K.A., apparently unaware of that, called to check on the status of the appeal on February 22, 2022, after which United sent the appeal denial described below.

[7] J.A. actually authored at least portions of the letter, but since K.A. is the plaintiff in this case, I will continue to refer to him as the claimant.

8

specifically highlighted L.A.'s self-inflicted cuts from September while at Shelterwood. K.A. also included in this appeal several letters from clinicians who had treated or were contemporaneously treating L.A., each of whom advised it was their opinion that L.A. needed continued residential treatment. Lauren Madden, LCPC-- L.A.'s outpatient therapist since April 5, 2021--stated in a November 5, 2021 letter:

> [L.A.]'s primary concerns included social anxiety, ADHD and related concerns (executive functioning issues and impulsivity), and low self-esteem. [L.A.] had been engaged in other levels of care (IOP [intensive outpatient] through Compass) that had not contributed to lasting symptom management. During our work together, [L.A.] experienced rapid fluctuations in confidence and unstable sense of self, still struggling with external stressors including relational strain due to not feeling understood and negative core beliefs, despite evidence supporting these beliefs by [L.A.] to not be true. Outpatient therapy then began to include family sessions due to concerns regarding [L.A.'s] increased depression and statements of self-harm and/or suicidal ideation. This writer was consulted regarding being able to keep [L.A.] safe at an outpatient level of care.
>
> [L.A.] has the capability to be very insightful and utilize learned material in a structured setting. Client's mood instability, executive functioning struggles, and tendency to be susceptible to outside influence poses a concern surrounding maintenance of a stable presentation when transitioning to a less structured setting. [L.A.] also has a history of medication noncompliance which may contribute to decompensation without continued monitoring. Due to these concerns, I consider continued residential treatment to be necessary for [L.A.] at this time.

AR 171.

L.A.'s pediatrician, Shana Christian, M.D., came to a similar conclusion, writing in a letter dated November 3, 2021:

> It was a medical necessity that [L.A.] be transferred into a residential treatment program because of her increasing depression and suicidal ideation despite regular and ongoing outpatient therapy and medication, including intensive outpatient treatment (IOP), in the past year. Obviously, these treatments were inadequate for [L.A.] Given the encouraging report that [L.A.] has been making progress during her brief time in her residential treatment program, it is obviously a program she needs to remain involved in. In my opinion as her pediatrician it is a medical necessity that she remain in the residential program at Shelterwood to allow her to continue to make progress towards more stable mental health before being transitioned back to the outpatient setting. If she is transitioned back to intensive outpatient treatment too soon, her mental status would assuredly worsen/relapse, along with the chance that her suicidal ideation would return. It is for her long term health and safety that I highly recommend [L.A.] be allowed to remain in the program she is currently in and that insurance coverage would be extended until the providers that she is currently working with at Shelterwood feel confident that she is ready for discharge and can continue to make healthy and steady progress in an outpatient setting.

AR 173.

L.A.'s psychiatrist, Michael Feld, M.D., wrote in a December 2, 2021 letter:

> Despite her improvement, in 8/21 her symptoms of depression worsened to the point where she was at significant risk of harm to herself--both SIB [self-injurious behaviors] and risk of suicide. . . . [L.A.] was clearly a proper candidate for RTC treatment due to her risk of harm and significant mental health struggle. [L.A.] continues to clearly need continued RTC to help her be at no risk of harm and able to function in her daily living environment. I strongly believe it continues to be medically necessary that [L.A.] continue in her current RTC treatment intervention.

AR 175-76 (underlining in original).

United Behavioral Medical Director Sabah Chammas, M.D., reviewed L.A.'s clinical history, the appeal letter, and prior United documentation. Dr. Chammas calculated a CASII composite score of 16, which meets the criteria for outpatient treatment. Dr. Chammas also spoke to Paul Wilson who, according to United's internal notes, stated that L.A. "has done very well over the dates being reviewed," "has not had any self harm during the dates being reviewed and has not been suicidal or homicidal . . . [or] had any violence against others." AR 1978. "[T]he crux of the matter," in Wilson's view, "is that [L.A.] is a transgender male" and "the parents have struggled to accept that due to religious reasons." *Id.* Dr. Chammas decided to uphold the adverse benefit determination.

United communicated this result to K.A. in a letter signed by Dr. Chammas and dated March 1, 2022, explaining:

> After talking to the provider and based on The American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 for Level 5 - Non-Secure 24-Hour Services with Psychiatric Monitoring which is applicable to the mental health residential level of care., [sic] it is my determination that no further authorization can be provided from 10/11/2021 forward.

> After talking to the provider it is noted your child has made progress and that your child's condition does not meet Guidelines for further coverage of treatment in this setting.

> Criteria are not met . . . due to:

- Your child is better.
- Your child is not having significant behavioral problems.
- Your child is thinking clearly.
- Your child is learning coping skills.
- Your child does not have medical problems that need this level of care.
- Your child is participating in treatment.

Instead, care and recovery could continue in the MENTAL HEALTH Outpatient setting.

AR 1540-41. Continuing its pattern, United did not cite to any portion of L.A.'s medical records.

**External Appeal**

K.A. appealed yet again, this time externally to the Arizona Department of Insurance and Financial Institutions, which upheld United's denial. The external reviewer noted that L.A. "repeatedly denied any suicidal ideation, intent or plan," and that although L.A. had one incidence of self-harm (apparently with a piece of glass that L.A. surrendered in May 2022), L.A. was "overall" "able to engage in treatment." AR 2682. The reviewer also observed that psychiatric care for adolescents should be provided in the "least restrictive environment that provides treatment as well as allows for safety." *Id.*

**This Suit**

L.A. remained at Shelterwood until August 4, 2022, and to date has not received coverage through United for time spent there

since October 11, 2021. K.A., having exhausted his administrative remedies pursuant to the Plan, filed this suit on May 15, 2023 in the United States District Court for the District of Utah. The case was transferred to this court in November 2023.

## II.

Because the Plan in this case grants the administrator "discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with the terms of the Plan," AR 2149, 2306, United's adverse benefit determination may be overturned only if it is arbitrary and capricious. *See Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).[8] This standard is "deferential but 'not a rubber stamp.'" *Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 539 (7th Cir. 2018) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)). Review "turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,'

---

[8] K.A. initially contended that de novo review applies here based on 50 Ill. Admin. Code § 2001.3, which he asserts prohibits language prompting deferential review in insurance policies sold or delivered in Illinois. He withdrew that position after United pointed out that the Plan was neither sold nor delivered in Illinois, so all now agree that my review is for whether United acted arbitrarily and capriciously.

13

and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)).

K.A. first presses the argument that United failed to satisfy ERISA's procedural requirement that he be afforded a "full and fair review" of a benefit denial. When a plan administrator denies benefits, it must "provide adequate notice in writing" to the claimant "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). The administrator must further "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." *Id.* § 1133(2). United notes that only substantial compliance, not strict compliance, is required for § 1133's procedural requirements and those espoused in the associated regulations. *See* Def. Resp., ECF 56 at 3 (citing *Jacobs v. Guardian Life Ins. Co. of Am.*, 730 F. Supp. 2d 830, 846 (N.D. Ill. 2010)). But for the reasons explained below, United failed to comply with these requirements, substantially or otherwise.[9]

---

[9] Furthermore, the Seventh Circuit observed in *Fessenden v. Reliance Standard Life Insurance Co.*, 927 F.3d 998, 1003 n.3 (7th

K.A. focuses on United's failure to address the evidence he submitted with his appeals. United's denial letters, for example, do not address L.A.'s September self-harm incident and therapy notes from October 7, 2021 suggesting suicidal ideation. This, despite K.A.'s letter specifically noting concerns around self-harm and suicide.

Most notably, as part of the second-level appeal K.A. submitted letters from L.A.'s medical providers that stated their unequivocal view that L.A. continued to require residential treatment. Two of those providers--Madden (L.A.'s outpatient therapist) and Dr. Christian (L.A.'s pediatrician)--observed in particular that outpatient treatment had proven ineffective for L.A. The providers voiced other concerns too, including that L.A. had a history of medication noncompliance when in a non-residential setting (Madden); that a transition to less intensive care so soon after beginning treatment at Shelterwood would cause L.A.'s condition to deteriorate (Madden and Dr. Christian); and that removing L.A. from residential treatment would place L.A. at risk of harm (Dr. Feld, L.A.'s psychiatrist).

---

Cir. 2019), that the judge-made substantial compliance exception was overruled by regulation in 2018, at least as to ERISA claims for denial of disability benefits. I need not determine whether the substantial compliance exception survives in the medical benefit context because even if it does United does not satisfy it.

United's letter denying K.A.'s second-level appeal does not mention any of these letters, nor does it substantively respond to the concerns they raise. Though plan administrators need not "accord special weight to the opinions of a claimant's physician" or carry a "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," nor may they "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). United's letter includes the general statement, "After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode . . .," AR 1540, and similar language, but that does not suffice to show that United considered the letters K.A. submitted. *See Sadowski v. Tuckpointers Loc. 52 Health & Welfare Tr.*, 281 F. Supp. 3d 710, 720 (N.D. Ill. 2017) ("[A] mere statement that 'all relevant medical evidence had been considered' without addressing contrary evidence or the statements of the treating physician is insufficient." (citing *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009))).

K.A. marshals recent decisions from the Tenth Circuit finding United violated ERISA's procedural requirements in cases similar to this one. *See D.K. v. United Behav. Health*, 67 F.4th 1224 (10th Cir. 2023); *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293

16

(10th Cir. 2023); *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207 (10th Cir. 2023); *see also Dwyer v. United Healthcare Ins. Co.*, 115 F.4th 640 (5th Cir. 2024) (engaging in similar analysis as the Tenth Circuit and "join[ing] a growing number of decisions rejecting similar denial letters issued by United across the country" (citing cases)). Though I find the reasoning in those opinions persuasive, they go beyond current Seventh Circuit case law in some respects. In any event, the law in this circuit is clear enough that plan administrators must do more than what United did here to survive arbitrary and capricious review.

In *Majeski*, the Seventh Circuit emphasized that "procedural reasonableness is the cornerstone of the arbitrary-and-capricious inquiry." 590 F.3d at 484. The plan administrator in that case denied the plaintiff an opportunity for a full and fair review by ignoring the evidence she submitted, and its failure to address that evidence in its communications with her amounted to an absence of reasoning, which rendered its decision arbitrary and capricious. *Id.* Indeed, the *Majeski* court observed that circuit precedent "unambiguously requires a plan administrator to 'address any reliable, contrary evidence submitted by the claimant.'" *Id.* (quoting *Love*, 574 F.3d at 397).

In this case, United's lack of engagement with the letters submitted by L.A.'s providers, each of which rebutted the reasons communicated by United for why continued residential treatment for

L.A. was no longer medically necessary, rendered its decision arbitrary and capricious.[10]

Communications to K.A. aside, United does not point to anything even in its internal notes suggesting its reviewers seriously considered the letters from L.A.'s providers. The closest it gets is the following cursory observation by Dr. Chammas in reviewing the second-level appeal: "Records reviewed: . . . The appeal letter and documents from the mother contained letters of support for RTC MH from various clinicians." AR 1976. United cannot absolve itself of its duty to consider K.A.'s evidence merely by acknowledging its existence. Not that having done so internally would make a difference here, since the relevant shortcoming is United's failure to sufficiently explain its decision to K.A. in its communications during the appeal process. Nonetheless, I raise the absence of meaningful discussion in United's internal notes, even though unnecessary to find that United acted arbitrarily and capriciously in this case, because it underscores United's complete disregard of those competing views. In short, United violated ERISA by failing to provide K.A. with the "full and fair

---

[10] In its briefs, United offers some reasons for why it discounted L.A.'s providers' letters, but ERISA demands that claimants be afforded a "full and fair review" before coming to court. *See Aviation W. Charters, LLC v. Health & Welfare Plan for Emps. of Ajinomoto USA, Inc.*, 425 F. Supp. 3d 1016, 1025 (N.D. Ill. 2019) (explaining that if a plan administrator has reasons for discounting claimant's evidence, "it [is] obligated to say so and to explain why that was the case" in communications with claimant).

review" it demands. *See Love*, 574 F.3d at 396 (finding denial arbitrary and capricious where denial letters failed to "explain[] *why* the reviewer chose to discredit the evaluations and conclusions of [the claimant's] treating physicians" (emphasis in original)); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003) ("[W]ithin reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review." (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 (7th Cir. 1992))).

### III.

"Under ERISA, remedies are based on equitable principles and therefore courts have discretion to fashion an appropriate remedy in any given case." *Williams v. Grp. Long Term Disability Ins.*, No. 05 C 4418, 2006 WL 2252550, at *9 (N.D. Ill. Aug. 2, 2006) (citing 29 U.S.C. § 1132(a)(3)); *see also Halpin*, 962 F.2d at 697 (district courts' decisions to reinstate benefits or remand for further consideration are reviewed for abuse of discretion). Where plan administrators act arbitrarily and capriciously in initially denying benefits, the most common remedy is to remand to the administrator for a new review. *See Hackett*, 315 F.3d at 776. But in a case like this where benefits had initially been approved and later terminated under "defective procedures," the "*status quo* prior to the defective procedure was the continuation of benefits." *Id.* Thus, "[r]emedying the defective procedures requires a

19

reinstatement of benefits." *Id.; see also Schneider v. Sentry Grp. Long Term Disability Plan*, 422 F.3d 621, 629-30 (7th Cir. 2005) ("'[R]etroactive reinstatement of benefits is the proper remedy' when, for instance, a plan's claims procedure 'did not comply with ERISA's requirements for full and fair review.'" (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998))).

Thus, K.A. is entitled to reinstatement of benefits from October 11, 2021 through the date L.A. departed Shelterwood on August 4, 2022. *See Dominic W. ex rel. Sofia W. v. N. Tr. Co. Emp. Welfare Benefit Plan*, 392 F. Supp. 3d 907, 922 (N.D. Ill. 2019) (concluding in case where benefits paid for mental health residential treatment were terminated, reinstatement was appropriate remedy where termination arose from arbitrary and capricious procedure).

It is not clear from the parties' briefing whether they agree on the amount of benefits applicable to that period. Additionally, K.A. requests an opportunity to brief the issue of his entitlement to prejudgment interest and attorneys' fees. The parties are instructed to meet and confer to attempt to reach an agreement regarding these issues and shall file a status report addressing their progress within 21 days of this order as further explained below.

IV.

For the foregoing reasons, K.A.'s motion for summary judgment is granted. United's motion for summary judgment is denied. The parties are instructed to meet and confer in an attempt to agree on the amount of retroactive benefits, as well as prejudgment interest and attorneys' fees, if any. The parties shall file a status report within 21 days of this order reporting on the results of those discussions. To the extent they cannot reach agreement on one or more of the issues, they shall propose a briefing schedule to resolve them.


**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: January 31, 2025